**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
*Southern Division*

| | |
|---|---|
| **ELIZABETH ALEXANDER,** | * |
| **Plaintiff,** | * |
| **v.** | *        **Case No.: PWG-17-3283** |
| **BLOOMINGDALE'S, INC.,** | * |
| | * |
| **Defendant.** | * |

\*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*

**MEMORANDUM OPINION**

Elizabeth Alexander, a Caucasian woman, worked for Bloomingdale's, Inc. ("Bloomingdale's") for seventeen years, receiving repeated praise for her success as a sales associate. Jt. Stip. Facts ¶¶ 4, 9, 10, 35, 45, ECF No. 34-1. Yet, during the same time period, she also received "'Formal Reminder[s],'" a form of "written discipline" that Bloomingdale's uses, *id.* ¶¶ 28, 31, 39, 41, and twice Bloomingdale's placed her on "'Decision Making Leave', the highest form of discipline within the Responsibility based Performance system prior to termination," *id.* ¶¶ 34, 46. And, she had numerous interactions with non-Caucasian co-workers and supervisors that, in Ms. Alexander's view, created a hostile work environment. Ultimately, Bloomingdale's terminated Ms. Alexander's employment in 2016. She filed suit, alleging race discrimination, in the form of a hostile work environment, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), and retaliation, in violation of Montgomery County Code § 27-1 *et seq.* Am. Compl., ECF No. 4; *see* Compl., ECF No. 2. Now pending is the Motion for

Summary Judgment, ECF No. 30, that Bloomingdale's filed.[1] Because Ms. Alexander cannot prevail on either of her claims as a matter of law, I will grant Defendant's motion.

## Factual Background[2]

Ms. Alexander alleges that the actions of her supervisor Watani Hatcher and her co-workers Marva Lynch and Genet Oda created a hostile work environment. Am. Compl. ¶¶ 27–31. Ms. Lynch, an African-American woman, allegedly "called her the most despicable person she ever met and . . . used vulgar language toward her." Jt. Stip. Facts ¶ 23. Mr. Hatcher, an African-American man, called her a "mental case" or said that she had "mental issues," which he admitted to doing. Alexander Dep. 108:3–5; Ambach Dep. 51:4–21, ECF No. 34-10; Ambach Decl. Ex. J, ECF No. 34-13, at 23 (personnel notes memorializing incident). Ms. Alexander also claims that he denied her overtime, scheduling accommodations, and training opportunities. Am. Compl. ¶ 14; Handwritten Complaint to Bloomingdale's, ECF No. 34-32 (claiming that Hatcher dismissed her February 15, 2015 request for training); Alexander Aff. ¶ 29, ECF No. 34-22.

Yet, Ms. Alexander conceded that she does not "know [Mr. Hatcher's and Ms. Lynch's] motivation" for their actions and statements, which did not explicitly refer to race. Alexander Dep. 75:10–76:3. She believed that the harassment was race-based simply because she is "a white individual and they're African American." Alexander Dep. 170:21–171:3; *see id.* at 169:25–170:4. And, she admitted in her deposition testimony that she did not know whether any employees at the Bloomingdale's store where she worked received more overtime hours than she

---

[1] The parties fully briefed the motion. ECF Nos. 30-1, 33, 34. A hearing is not necessary. *See* Loc. R. 105.6.

[2] To decide Bloomingdale's Motion for Summary Judgment, I consider the facts in the light most favorable to Ms. Alexander as the non-moving party, drawing all justifiable inferences in her favor. *Ricci v. DeStefano,* 557 U.S. 557, 585–86 (2009).

did, or whether Ms. Oda, a Black woman from Ethiopia, received more scheduling accommodations than she did. Alexander Dep. 77:11–79:17, 84:6–85:10, 167:25–168:5; *see also id.* at 87:25–88:1 (admitting that she did not know other employees' hours); 135:16–136:9 (admitting that two of the employees she named who were "allowed to work off the clock" were white "so it's half and half").[3] *Cf. id.* at 85:11–86:25, 87:5–7 (stating that "two Moroccan sisters" said that "they don't have any problems for accommodations" and "can do basically whatever they want to"; her "basis for believing that it was because of their race" was simply that the "store wanted to present a very, very good image . . . . in terms of treating people of diverse backgrounds"). Indeed, she stated that she was "not talking about the . . . statistical amount of overtime." *Id.* at 82:6–7. Notably, Alexander asserted that she "never had any problem to obtain overtime before the incident with Genet Oda of 2012 . . . ." *Id.* at 80:4–5. When asked for the "basis [she had] for claiming it was because of [her] race," she answered: "Because I reported racially hostile environment, pervasive, and constant." *Id.* at 80:18–21.

Ms. Alexander complained that Ms. Oda "called her a 'stupid white bitch' in May 2012," Jt. Stip. Facts ¶ 32, a statement Ms. Oda denies having said, Oda Dep. 47:3–48:1, ECF No. 34-19. Ms. Alexander asserted that she "immediately . . . reported this incident" to her supervisor, both

---

[3] Insofar as Ms. Alexander stated in an affidavit that "similarly situated black sales associates" received "scheduling accommodations and overtime hours," Alexander Aff. ¶ 29, ECF No. 34-22, this statement is too vague and conclusory to create a genuine dispute of material fact or be considered in opposition to Defendant's summary judgment motion. *See Thompson v. Potomac Elec. Power Co.*, 312 F.3d 645, 649 (4th Cir. 2002) (noting that "[c]onclusory or speculative allegations" do not create a genuine issue of material fact); *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 962 (4th Cir. 1996) (holding that "summary judgment affidavits cannot be conclusory"); *Glass v. Anne Arundel Cty.*, 38 F. Supp. 3d 705, 712 (D. Md. 2014) (noting that Rule 56(c) permits the court to "strike portions of affidavits that . . . rest on conclusory [sic] statements"); *see also Wang v. Metro. Life Ins. Co.*, 334 F. Supp. 2d 853, 863–64 (D. Md. 2004) ("'vague claims of differing treatment' by the plaintiff are insufficient to demonstrate disparate treatment" (citation omitted)).

verbally and in writing. Alexander Dep. 38:7–8, 21–25, 39:2–8, 58:11–19.[4] She stated that she "repeatedly asked about the investigation" that she was "promised" would take place, but "was never informed about the results of that investigation." *Id.* at 39:8–40:5.

The next incident with Ms. Oda that Ms. Alexander complained about was in May 2014, when she told Susan Cannaday, the general manager of Bloomingdale's Chevy Chase, Maryland store, where Ms. Alexander worked at the time, that "Genet Oda, due to jealousy over the sales, was bullying [her]." Alexander Dep. 48:9–12. Then, in November 2014, Ms. Alexander complained that Ms. Oda "used aggressive sales techniques and had threatened that Plaintiff should watch out for herself." Jt. Stip. Facts ¶ 32. Specifically, Ms. Oda was "making faces" at her, "bullying" her and "shouting at [her]," and in June 2014, five months before Ms. Alexander complained, Ms. Oda had knocked her phone off the counter and broken it. Alexander Dep. 48:2–49:4.[5] Ms. Alexander testified that Ms. Oda's "behavior was constantly offensive toward [Plaintiff]." Alexander Dep. 37:14–16. She claims that Ms. Oda "was very upset that [Plaintiff] had many clients coming to [her]." *Id.* at 48:2–8.

Ms. Alexander "filed an incident report with the Montgomery County Police Department against Genet Oda for alleged 'harassing communications' at work," Jt. Stip. Facts ¶ 33; *see* Incident Report, ECF No. 33-31 (stating that Ms. Alexander had "at least three" incidents with Ms. Oda that left Plaintiff "feeling intimidated and threatened"; Ms. Oda would "harass [Ms. Alexander] around the work place and try to bully customers into making purchases from her instead"; Ms. Oda called her a "stupid white bitch" two years earlier and more recently broke her

---

[4] Ms. Alexander also testified, to the contrary, that the first time she reported that Ms. Oda called her a "stupid white bitch" was in November 2014. Alexander Dep. 60:19–61:2.

[5] According to Ms. Oda, the phone incident was an accident and the phone worked fine after the batteries were reinserted. Oda Dep. 53:20–56:2.

phone into pieces; and a car "occupied by one, not white, male" followed Ms. Alexander home from work one day). Ms. Alexander stated:

> [T]he main issue of that report was the threats that I received from Genet Oda. She threatened me, You don't know what I can do for(sic) you outside of Bloomingdale's. And you can be very sorry, and nobody will find you. And I am telling you the last time, and I know so many people.

> And it means that so many people that it can cover for her. I was so frightened. On that day also, I went to security department in our store. I reported everything to the security because I was so scared.

Alexander Dep. 49:19–50:4.

Ms. Alexander made the same complaints to Bloomingdale's. *Id.* at 52:17–54:2, 59:20–60:18. When asked whether she complained to Bloomingdale's that she was being discriminated against based on her race, Plaintiff testified that this conduct amounted to "physical threats, but there were no racial slurs." *Id.* at 56:1–12. She testified that, after Ms. Oda's May 2012 comment, there were no "other race comments that . . . were made to [her] while [she was] at Bloomingdale's." *Id.* at 61:3–8.

Additionally, she complained that, on "multiple occasions," Ms. Oda drove her car deliberately "towards [Plaintiff] when [she] was walking in the parking garage," making "intimidating gestures" and faces and causing Plaintiff to have to "move to the other side" and to be "afraid about [her] safety." Alexander Dep. 67:11–68:19; Alexander Aff. ¶¶ 26–28, ECF No. 34-22; Ambach Dep. 92:7–14, ECF No. 34-10. Oda also denies this allegation. Oda Dep. 37:14–39:3, 41:16–42:8. Plaintiff stated that "the security officers at [the] store . . . escorted [her] . . . about twice to [the] garage." Alexander Dep. 66:23–25. She claimed that the incidents in the parking lot occurred "over the last few years of [her] employment," Am. Compl. ¶ 20, but she did not provide specific dates. She eventually reported it to Bloomingdale's, stating that it "happened

many times in the past" and that she had "informed . . . the security department of the store." Alexander Dep. 69:7–20.

Also, in June 2015, she "complained to the management at Bloomingdale's that Ms. Oda referred to her as a 'trash woman.'" Jt. Stip. Facts ¶ 37. Ms. Oda denies this allegation as well. Oda Dep. 48–49. Then, in December 2015, Ms. Alexander and Ms. Oda "had a verbal altercation [in the stockroom at work], after which both Plaintiff and Oda complained about one another to store management." Jt. Stip. Facts ¶ 42; *see* Alexander Dep. 61:9–13 (stating that she complained that Ms. Oda "threatened [her] in December 2015, again, in the stockroom"). Ms. Alexander stated that Ms. Oda's "behavior was . . . harassment, intimidation," but she did not complain to Bloomingdale's that the conduct was "because of [her] race." Alexander Dep. 64:20–65:15. The store investigated Oda's and Alexander's complaints against each other. *Id.* at 62:12–63:5.

Meanwhile, Ms. Alexander received repeated warnings from her employer regarding her conduct at work. She received a Formal Reminder[6] on May 22, 2014, noting that she had "been

---

[6] If an employee's "performance or conduct falls short, [the employee's] manager will meet with [him or her] and talk with [him or her] about what is needed to meet expectations. . . . This reminder will be placed in [the employee's] file." Associate Handbook, Agnew Decl. Ex. A, ECF No. 34-6, at 22. Bloomingdale's refers to this as "Formal Reminder One"; if it does not result in the employee's "performance or conduct . . . improv[ing] to the expected level," then the employee and his or her "manager may revisit [the] earlier conversation about performance expectations and help [the employee] understand what [his or her] focus should be to improve [his or her] performance or conduct." *Id.* at 22–23. That second reminder, "Formal Reminder Two," also is placed in the employee's file. *Id.* at 23. The final step after two reminders is "Decision Making Leave." The Associate Handbook states:

> Finally, if after these two reminders you don't meet expectations, your manager may meet with you again and talk with you about your responsibility to meet expectations . . . . You may be asked to think over whether or not you want to continue your employment with Bloomingdale's. You may be given a decision making leave with pay (no more than 1 shift) to think about this and make a decision.

*Id.* If the employees chooses to continue to work at Bloomingdale's but his or her "performance or conduct does not meet Bloomingdale's expectations it may result in immediate termination."

disrespectful to [her] team mates, or refused to follow the direction of [her] supervisor or a store senior." May 22, 2014 Formal Reminder 1, ECF No. 34-9; *see also* Jt. Stip. Facts ¶ 28. Specifically,

> [O]n March 13th, [Alexander] had an incident with [her] supervisor regarding the scheduling of a rally. When a senior supervisory came to address the issue with both involved parties, [Alexander] refused to acknowledge her attempt to mediate and resolve the issue, and simply walked away. This has been a pattern for [Alexander], making it a challenge to deliver feedback

May 22, 2014 Formal Reminder 1. Additionally, she had charged a "registered bride" for an item that was not in stock, which was against store policy. *Id.* And, Ms. Alexander had, "on many occasions . . . asked [a co-worker] to put [her] in 'ringer' mode, often when [she was] scheduled for [her] break," even though it also was "against policy to work when [she was] on a break." *Id.* The Formal Reminder cautioned that, if the employee's conduct did "not improvie, th[e] process may result in additional reminder(s) or [she] may be asked to decide if [she]'d like to continue [her] employment at Bloomingdale's. *Id.* at 2. Ms. Alexander left the May 22, 2014 meeting with Human Resources Executive Nancy Ambach without signing the Formal Reminder. *Id.*

Alexander received another Formal Reminder on November 6, 2014, citing "several conversations regarding insubordination, particularly in [her] interactions with [her] manager, Watani Hatcher." Nov. 6, 2014 Formal Reminder 1, ECF No. 34-11; Jt. Stip. Facts ¶ 31. The Formal Reminder stated that Ms. Alexander had walked away, slamming a door while Hatcher

---

*Id.* Notably, the "manager may not necessarily use all of these steps and under certain circumstances immediate termination may be appropriate if [the employee's] behavior is considered a significant disregard of [his or her] commitment to the expectations of the Bloomingdale's values," and "[n]othing in this policy modifies the employment-at-will doctrine." *Id.*

was speaking to her.  Nov. 6, 2014 Formal Reminder 1.  Again, she did not sign the Formal Reminder.  *Id.* at 2.

Then, on February 11, 2015, Ms. Alexander received Decision Making Leave; the form that stated that, despite being told on December 17, 2014 that Bloomingdale's "needed to observe improvement in [her] positive and productive communication" with her manager," Ms. Alexander persisted in failing to copy her manager on email correspondence with clients, and she continued to "work off the clock," even though she previously had been told that she could not do so.  Feb. 11, 2015 Decision Making Leave Form 1, ECF No. 34-12; *see also* Jt. Stip. Facts ¶ 34. Additionally, Mr. Hatcher reported that Ms. Alexander "'mocked' him" and whispered to a client in front of him. Feb. 11, 2015 Decision Making Leave Form 1. Ms. Alexander refused to sign the form or take a "DML [Decision Making Leave] day, although she did agree to meet with Mr. Hatcher within three days and respond at that time.  *Id.* at 3.

She received another Formal Reminder on June 25, 2015, which she also refused to sign. June 25, 2015 Formal Reminder 1, 3, ECF No. 34-14; *see also* Jt. Stip. Facts ¶ 39.  The Formal Reminder stated that "a significant amount of Personal Client Information . . . for a number of [Alexander's] clients" had been "found in a stockroom" on June 13, 2015," which violated company policy.  June 25, 2015 Formal Reminder 2.  On December 9, 2015, Ambach met with Ms. Alexander and "attempted to share with her the addendum that had been drafted for her [February 2015 Decision Making Leave]," but Ms. Alexander "would not read it or sign it," even though it was handed to her.  Ambach Decl. Ex. C, ECF No. 34-13, at 6.  The addendum described incidents in which Ms. Alexander was disrespectful to her co-workers in front of clients; it stated that Ms. Alexander's "performance/conduct [wa]s not meeting Bloomingdale's expectations" and

cautioned that a "[f]ailure to be professional and respectful may lead to disciplinary action up to and including termination." Ambach Decl. Ex. B, ECF No. 34-13, at 4.

Finally, Alexander received Decision Making Leave for a second time on April 14, 2016, noting that Bloomingdale's had "had numerous conversations related to [Alexander's] level of respect towards [her] co-workers" and had "spoken to [her] about respectful treatment of [her] supervisor, and of other selling partners both in [her] department, and in other departments in [the] store." April 14, 2016 Decision Making Leave Form 1, 3, ECF No. 34-16; *see also* Jt. Stip. Facts ¶ 46. The Decision Making Leave Form described incidents on December 23, 2014 and February 5, 2015, in January 2016, and on February 1, 2016 and March 21, 2016 in which she had been disrespectful to co-workers and a senior manager and had worked, without permission, during her time off. April 14, 2016 Decision Making Leave Form 3. She refused to sign the form. Agnew Dep. 9:16–18, ECF No. 34-15. She did, however, submit the required "Commitment Statement," asserting that she "submit[ted] this statement of [her] sincerity, loyalty and commitment to subscribe to and fulfill [her] responsibilities in the performance and conduct of [her] position with the highest level of professional behaviors" and she "reiterate[d] the statements [she] made in [her] January 2016 commitment that [she would] continue to satisfy all the performance and conduct regulations and procedures established by Bloomingdale's." Commitment Statement, ECF No. 34-17.

Ms. Alexander filed an EEOC charge on April 26, 2016. Jt. Stip. Facts ¶ 48. On June 3, 2016, Ms. Alexander was "scheduled to be off at 6:30" but did not clock out until 7:07 and then continued to work until 7:38 p.m. or later, and her new manager, Zahra Fardshisheh, informed the Group Sales Manager that Ms. Alexander was working off the clock again. Alexander Dep.

180:24–181:1, 187:9–190:16, ECF No. 34-3.[7]  According to Ms. Alexander, "what [the] schedule said and what were actual demands from customers were two different things," so "it was common practice . . . that other employees used to stay . . . and either call customer service on returns and Macy's furniture customers service or calling clients because many times [there] were urgent calls from customers in regard [to] delivery."  *Id.* at 188:11–16, 189:2–4.  She insisted that "working off the clock" was "common policy in [the] department, everybody was doing that," but "[]t was okay for them; not okay for [her]."  *Id.* at 190:4–16.

On June 3, 2016, Ms. Alexander complained to Bloomingdale's that "Zahra Fardshisheh assaulted her while Plaintiff was engaged in a phone conversation with Bloomingdale's customer service."  Jt. Stip. Facts ¶ 51.  Fardshisheh later received a Formal Reminder that stated that Fardshisheh "acted in an aggressive manner when [Alexander] refused to hand [her] the phone when she was speaking to an associate in furniture customer service" and that, "[a]lthough [Fardshisheh] had no physical contact with [Alexander], [Fardshisheh's] actions were inappropriate and made her uncomfortable."  Fardshisheh Formal Reminder 1, ECF No. 34-18.  Fardshisheh acknowledged that she "was caught up in the frustrations of the moment when [she] acted."  *Id.* at 2.  In Ms. Alexander's view, Ms. Fardshisheh's actions, both in reporting her work beyond her scheduled time and in the phone incident, were retaliatory.  Alexander Dep. 190:12–16, 191:23–193:7.

On June 8 and June 9, 2016, Ms. Alexander "stayed beyond [her] work time by hours without approval of [her] manager"; she insisted that she did not need permission to work overtime because that requirement "didn't apply to [her] because customers were coming and they were

---

[7] Pages 1–184 of Alexander's deposition appear in ECF No. 34-2; pages 185–302 appear in ECF No. 34-3.

flowing to [her], . . . and [she] had millions of sales to prove that." Alexander Dep. 193:8–194:8, 195:10–196:1.

She also worked additional hours without approval on June 10, 2016 and June 11, 2016. *Id.* at 196:3–8, 197:14–200:8. She testified that she did not "remember exactly the circumstances" on June 11, 2016, but sales professionals "were staying long, long hours because the business required that," *id.* at 202:2–15, and as for June 10, 2016,

> There must have been reason for that. . . .
>
> . . . I must have clients who have been buying and there were customers' issues that I needed to—and as I said, I was a $1 million seller and I had tons of customers to attend.
>
> And if Bloomingdale's wants to change its own operating rules that there is no need for multimillion dollar producers and all of this fraudulent hour (sic) process, then this will be applicable.

*Id.* at 196:7–20. She stated that she did not seek her supervisor's permission "because she was abusive and she interfered with [her] professional way of conduct." *Id.* at 200:18–201:9. Ms. Alexander stated that she stayed late "because [she] had legitimate reasons to take care of [her] clients." *Id.* at 201:10–21.

Bloomingdale's terminated Ms. Alexander's employment on June 29, 2016. Jt. Stip. Facts ¶ 53.

## Standard of Review

Summary judgment is proper when the moving party demonstrates, through "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials," that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a), (c)(1)(A); *see Baldwin v. City of Greensboro*, 714 F.3d 828, 833 (4th Cir. 2013). "A disputed fact presents a genuine issue 'if the evidence is

such that a reasonable jury could return a verdict for the non-moving party.'" *Cole v. Prince George's Cty.*, 798 F. Supp. 2d 739, 742 (D. Md. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). If the party seeking summary judgment demonstrates that there is no evidence to support the nonmoving party's case, the burden shifts to the nonmoving party to identify evidence that shows that a genuine dispute exists as to material facts. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87 & n.10 (1986).

## Discussion

### Hostile Workplace[8]

Title VII makes it "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of

---

[8] Ms. Alexander alleged in her Opposition that she "was denied scheduling accommodations and overtime hours that were granted to Plaintiff's black peers." *See* Pl.'s Opp'n 12; *see also* Alexander Dep. 77:11–79:17, 84:6–85:10, 134:19–22 (claiming that she was "denied overtime because of [her] race" and "denied scheduling accommodations . . . because [she was] white"; that "ladies working in the dress department . . . certainly had very easy accommodations when it comes to overtime and scheduling issues"; that Ms. Oda "was permitted to come to (sic) her days off without any problem"; and that other employees were allowed to work off the clock, while she was not). Yet, her Amended Complaint included only a claim for discrimination based on hostile workplace, not a claim for discrimination based on less favorable treatment than similarly situated employees of another race, *see White v. BFI Waste Servs.*, 375 F.3d 288, 295 (4th Cir. 2004) (stating elements of a less favorable treatment claim, which are distinct from those of a hostile workplace claim). An opposition to a dispositive motion is not a proper vehicle for amending the pleadings. *See Whitten v. Apria Healthcare Grp., Inc.*, No. PWG-14-3193, 2015 WL 2227928, at *7 (D. Md. May 11, 2015). Further, there is no evidence to support a less favorable treatment claim, as Ms. Alexander admitted in her deposition testimony that she did not know whether any employees at the Bloomingdale's store where she worked received more overtime hours than she did, or whether Ms. Oda received more scheduling accommodations than she did. Alexander Dep. 77:11–79:17, 84:6–85:10, 167:25–168:5; *see also id.* at 87:25–88:1 (admitting that she did not know other employees' hours); 135:22–136:9 (admitting that two of the employees she named who were allowed to work overtime were white "so it's half and half"). Therefore, even if Plaintiff's discrimination claim were based on less favorable treatment, Bloomingdale's would be entitled to summary judgment on the claim. *See White*, 375 F.3d at 295.

employment, because of such individual's race [or] color . . . ." 42 U.S.C. § 2000e-2(a)(1). To prove a violation of this statute, Ms. Alexander can establish "(1) unwelcome conduct; (2) that it is based on the plaintiff's . . . race; (3) which is sufficiently severe or pervasive to alter the plaintiff's conditions of employment and create an abusive work environment; and (4) which is imputable to the employer.'" *Boyer–Liberto v. Fontainebleau Corp.,* 786 F.3d 264, 277 (4th Cir. 2015) (quoting *Okoli v. City of Balt.,* 648 F.3d 216, 220 (4th Cir. 2011)). Bloomingdale's challenges Ms. Alexander's ability to prove all but the first element.

*1. Based on race*

The second element is that the hostility must be because of the plaintiff's race. *See Boyer–Liberto*, 786 F.3d at 277. To demonstrate this element, the plaintiff must "prove that 'but for' his race . . . , he would not have been the victim of the alleged discrimination." *Walker v. Glaxosmithkline (GSK)*, No. RWT-15-2036, 2016 WL 4265341, at *4 (D. Md. Aug. 12, 2016) (quoting *Mosby-Grant v. City of Hagerstown*, 630 F.3d 326, 334 (4th Cir. 2010)); *see also Causey v. Balog*, 162 F.3d 795, 801 (4th Cir. 1998) (same); *Bacchus v. Price*, No. GJH-17-1511, 2018 WL 3575055, at *8 (D. Md. July 25, 2018) (same). Significantly, hostile conduct

> "due to personality conflicts will not suffice. Some persons, for reasons wholly unrelated to [age] or gender, manage to make themselves disliked." *Ziskie v. Mineta*, 547 F.3d 220, 226 (4th Cir. 2008). "Therefore, in order to survive summary judgment, there must be sufficient evidence for a reasonable jury to conclude that the alleged harassment stemmed not from personal animosity, workplace competition, or general boorishness, but rather from discriminatory animus." *Phillips v. Raytheon Applied Signal Tech., Inc.,* No. ELH–11–3230, 2013 WL 5440802, at *19 (D. Md. Sept. 27, 2013).

*Nesbitt v. Univ. of Maryland Med. Sys.*, No. WDQ-13-0125, 2015 WL 5731781, at *8 (D. Md. Sept. 28, 2015) (footnotes and emendations omitted). Additionally,

> [t]o be sufficient, the evidence must consist of more than speculation, circumstantial evidence, and "conclusory" or "general" statements—the plaintiff's

evidence must prove a direct or inferential connection between the plaintiff's allegations and her [race] supported by specific evidence.

*Id.* (quoting *Cepada v. Bd. of Educ. of Balt. Cty.*, 974 F. Supp. 2d 772, 784 (D. Md. 2013)). Stated differently, "conclusory statements, without specific evidentiary support, cannot support an actionable claim for harassment." *E.E.O.C. v. Xerxes Corp.*, 639 F.3d 658, 676 (4th Cir. 2011) (quoting *Causey v. Balog,* 162 F.3d 795, 802 (4th Cir. 1998)). Likewise, "allegations '[un]substantiated by accounts of specific dates, times or circumstances,' are too 'general' to suffice." *Id.* (quoting *Carter v. Ball,* 33 F.3d 450, 461–62 (4th Cir. 1994)); *see also Walker*, 2016 WL 4265341, at *4 ("Mere speculation as to racial . . .animus will not suffice to prove that [the plaintiff] suffered unwelcome conduct due to race." (quoting *Alexander v. U.S. Dep't of Veterans Affairs*, No. DKC 10-3168, 2012 WL 78874, at *5 (D. Md. Jan. 10, 2012))).

Ms. Alexander complains of unwelcome conduct by Mr. Hatcher, Ms. Lynch, and Ms. Oda. Of the numerous allegations of harassment, it is undisputed that only one was explicitly race-based: Ms. Oda called Ms. Alexander a "stupid white bitch." *See* Alexander Dep. 61:3–8 (acknowledging that, after Ms. Oda's May 2012 comment, there were no "other race comments that . . . were made to [her] while [she was] at Bloomingdale's"). This Court has held that "the addition of [a] word [identifying the person's race] to otherwise race-neutral insults is an indicator that the individual is being targeted because of his race, and thus satisfies the 'but for' prong of the *prima facie* test." *Tawwaab v. Virginia Linen Serv., Inc.*, 729 F. Supp. 2d 757, 775–76 (D. Md. 2010) (discussing the use of the insults "black motherf---ers," "black bastards," and "black Fresh Princes of Bel-Air").

Also, while "[f]acially neutral incidents may be included . . . among the 'totality of the circumstances' that courts consider in any hostile work environment claim," they only may be included if "a reasonable fact-finder could conclude that they were, in fact, based on sex." *Stewart*

*v. MTR Gaming Grp., Inc.*, 581 F. App'x 245, 247 (4th Cir. 2014) (quoting *Alfano v. Costello,* 294 F.3d 365, 378 (2d Cir. 2002)). Ms. Alexander testified in her deposition that all of the other unwelcome comments and acts "were discriminatory" and "related to race," Alexander Dep. 169:14–170:1, and she stated in her affidavit that, "[t]hroughout [her] employment with Bloomingdale's in Chevy Chase, an atmosphere of racial animosity existed in [her] department." Alexander Aff. ¶ 35, ECF No. 34-22. But, as noted, conclusory statements do not suffice to defeat summary judgment. *Xerxes Corp.*, 639 F.3d at 676; *Nesbitt*, 2015 WL 5731781, at *8; *Cepada*, 974 F. Supp. 2d at 784; *Wang v. Metro. Life Ins. Co.*, 334 F. Supp. 2d 853, 863–64 (D. Md. 2004) ("'vague claims of differing treatment' by the plaintiff are insufficient to demonstrate disparate treatment" (citation omitted)).

Moreover, Ms. Alexander explained that she believed that the unwelcome comments and acts "related to race *because . . . they were committed by Afro-Americans towards [her], a Caucasian woman*." Alexander Dep. 169:14–170:4 (emphasis added); *see also id.* at 170:21–171:3 (insisting that the other employees' statements and actions were racially motivated because she is "a white individual and they're African American"). The races of the actors and the employee claiming race-based discrimination does not establish that conduct is race-based. *See Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 282 (4th Cir. 2000) ("Law does not blindly ascribe to race all personal conflicts between individuals of different races. To do so would turn the workplace into a litigious cauldron of racial suspicion. Instead, legally sufficient evidence is required to transform an ordinary conflict . . . into an actionable claim of discrimination."). Nor does Ms. Alexander's personal conviction that race motivated her co-workers' actions. *See Ruffin v. Lockheed Martin Corp.*, 126 F. Supp. 3d 521, 530 (D. Md. 2015) (concluding that plaintiff's "status as the only African-American in her group does not permit a plausible inference that the

unwelcome conduct . . . was *based on* her race; observing that that "without evidence of racial epithets, [a] hostile work environment claim will likely fail," because "'mere speculation as to racial . . . animus will not suffice to prove that [plaintiff] suffered unwelcome conduct due to race'" (quoting *Alexander v. U.S. Dep't of Veterans Affairs*, No. DKC-10-3168, 2012 WL 78874, at *5 (D. Md. Jan. 10, 2012))).

Additionally, as for Mr. Hatcher and Ms. Lynch, Plaintiff admitted that she does not "know their motivation" behind their unwelcome conduct. Alexander Dep. 75:10–76:3. Without any evidence that Mr. Hatcher's or Ms. Lynch's conduct was because of Plaintiff's race, a reasonable jury could not find that Mr. Hatcher's or Ms. Lynch's unwelcomed conduct was "based on the plaintiff's race." *See Boyer–Liberto*, 786 F.3d at 277; *see also Xerxes Corp.*, 639 F.3d at 676; *Stewart*, 581 F. App'x at 247; *Nesbitt*, 2015 WL 5731781, at *8; *Cepada,* 974 F. Supp. 2d at 784.

As for Ms. Oda, Ms. Alexander attributed some of her hostility—specifically her conduct in the store between May and November 2014—to jealousy, not race. Alexander Dep. 48:2–12. Setting aside Ms. Alexander's allegations regarding Ms. Oda's conduct between May and November 2014, the incidents that remain include Ms. Oda's May 2012 use of the name "stupid white bitch," which clearly is race-based hostility, and the approximately seven times that Ms. Oda intimidated Plaintiff between June 2013 and June 2016 (her last three years of employment) by driving toward her making "intimidating gestures" and faces while she was walking in the parking garage, which clearly is physically threatening conduct. Alexander Dep. 67:11–68:19; Alexander Aff. ¶¶ 26–28, ECF No. 34-22; Am. Compl. ¶ 14. Ms. Alexander also testified in her deposition that Ms. Oda called her a "trash woman" in June 2015, and the two had an argument in a stockroom in December 2015.

A reasonable jury could find an "inferential connection between [a] plaintiff's allegations and her [race] supported by specific evidence" where a colleague made a race-based comment and soon thereafter engaged in hostile conduct that was not explicitly race-based. *See Nesbitt*, 2015 WL 5731781, at *8; *Cepada*, 974 F. Supp. 2d at 784. But here, the "stupid white bitch comment" occurred in 2012; the next specific allegations did not occur until the middle of 2014, almost two years later. Further, as noted, Plaintiff asserted that Ms. Oda's May through November 2014 actions were motivated by jealously, not race. Under these circumstances, it is not reasonable to infer that the later events would not have occurred but for Ms. Alexander's race, when many months had passed since the one use of a race-based comment, and the intervening hostile events were undisputedly not race-based. *See Mosby-Grant*, 630 F.3d at 334; *Causey*, 162 F.3d at 801; *Bacchus*, 2018 WL 3575055, at *8; *Walker*, 2016 WL 4265341, at *4.

Certainly, Ms. Alexander testified that the parking garage incidents occurred during the last three years of her employment, which means that one or more of the parking garage incidents may have happened as early as June 2013, before the conduct that Ms. Alexander attributed to jealously. But still, June 2013 was a full year after the May 2012 race-based comment, weakening any inferential connection. Moreover, while Plaintiff described the gestures and faces Ms. Oda made in the parking garage, she has not provided any dates—or even a date range narrower than three years—when these incidents occurred, which renders the testimony "too 'general' to suffice." *Xerxes Corp.*, 639 F.3d at 676 (quoting *Carter,* 33 F.3d at 461–62). In *Xerxes*, the Fourth Circuit concluded that the EEOC "failed to present sufficient evidence upon which a jury could conclude that Graham was subjected to a racially hostile work environment," reasoning:

> Graham's testimony consists of general statements that Churchey used a racial slur "a bunch of different times," and, later, that it was "[n]ot one occasion," However, his "best recollection" was only that this occurred at some point during his "time of employment" at Xerxes, which spanned from August 2004 until April 2007.

Graham's testimony is wholly unsupported by any detail, context, examples, or time frame. "Such [general] assertions, standing alone, are [simply] insufficient to sustain an actionable Title VII claim." *Gilliam v. South Carolina Dep't of Juvenile Justice,* 474 F.3d 134, 143 (4th Cir.2007).

*Id.* at 676–77 (citations to record omitted); *see also Skipper v. Giant Food Inc.*, 68 F. App'x 393, 399 (4th Cir. 2003) (observing that a plaintiff claiming hostile workplace "must substantiate his claim with reasonable specifics about the alleged incidents that underlie the claim," and therefore allegations that unnamed employees used racial epithets would not suffice). Thus, the May 2012 comment is the only race-based incident. *See Boyer–Liberto*, 786 F.3d at 277; *Xerxes Corp.*, 639 F.3d at 676; *Nesbitt*, 2015 WL 5731781, at *8; *Cepada,* 974 F. Supp. 2d at 784; *Wang*, 334 F. Supp. 2d at 863–64 (hostile workplace claim "unavailing" where plaintiff "failed to show [co-worker's] actions were racially motivated"); *see also Bacchus v. Price*, No. GJH-17-1511, 2018 WL 3575055, at *8 (D. Md. July 25, 2018) (dismissing hostile workplace claim because "[w]hile allegations that Plaintiff was either assaulted by Worsham or wrongly accused of assaulting Worsham could potentially rise to the level of severe and pervasive conduct, Plaintiff fails to allege that these actions were in any way related to her national origin"); *Nicole v. Grafton School, Inc.*, 181 F. Supp. 2d 475, 483, 485 (D. Md. 2002) (granting summary judgment in defendant's favor where employee did not offer any evidence that supervisor's treatment of her was race-based).

### 2. *Sufficiently severe or pervasive*

Ms. Alexander must clear a "high bar" to establish that the offensive conduct was sufficiently severe and pervasive:

Intermittent acts of harassment are insufficient to establish that a hostile work environment is severe or pervasive. Indeed, Title VII does not mandate civility in the workplace. . . .However, a work environment can be considered hostile if it is "consumed by remarks that intimidate, ridicule, and maliciously demean the status of [a protected class]."

*Engler v. Harris Corp.,* 2012 WL 3745710, at *5 (D. Md. Aug. 28, 2012) (citing *E.E.O.C. v. Sunbelt Rentals, Inc.,* 521 F.3d 306, 315 (4th Cir. 2008)) (internal citations omitted). Thus, "'simple teasing,' offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" *Faragher v. City of Boca Raton,* 524 U.S. 775, 788 (1998) (citations omitted).

To show that the environment is "sufficiently severe or pervasive," Ms. Alexander must demonstrate "not only that [s]he subjectively perceived h[er] workplace environment as hostile, but also that a reasonable person would so perceive it, i.e., that it was objectively hostile." *Fox v. Gen. Motors Corp.,* 247 F.3d 169, 178 (4th Cir. 2001). To determine whether an environment is objectively hostile, the Court considers "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* (quoting *Walton v. Mental Health Ass'n*, 168 F.3d 661, 667 (3d Cir. 1999) (quoting *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 23 (1993))). For example, in *Strothers v. City of Laurel, Maryland*, 895 F.3d 317 (4th Cir. 2018), the Fourth Circuit concluded that the employer "significantly altered terms and conditions of Strothers' employment" by "chang[ing] Strothers' daily arrival time," when that time "was expressly bargained for by the employee and had a significant effect on the employee's decision to accept the job"; and also "chang[ing] the dress code as applied to Strothers, . . . publicly humiliat[ing] her" and "institut[ing] a policy that forbid Strothers from leaving her desk, including to use the restroom, without specific approval." *Id.* at 331–32. The court reasoned that "a reasonable jury could find that the alleged harassment was a daily occurrence that pervaded numerous aspects of Strothers' employment." *Id.* at 332.

Here, even if inferences of racial hostility could be drawn for Ms. Oda's conduct in the parking garage, as well as for the June and December 2015 incidents, these events, along with the May 2012 comment, total approximately ten incidents over the course of four years. That is just over two incidents per year, better classified as intermittent and isolated than frequent, permeating or consuming. Nonetheless, driving a car toward a pedestrian while making menacing faces and gestures is, without question, physically threatening and severe, and such conduct could establish a hostile workplace. *See Faragher*, 524 U.S. at 788; *Fox*, 247 F.3d at 178.

But, despite Ms. Alexander's current complaints, the evidence does not show that she perceived the events as hostile at the time. Rather, while Ms. Alexander "informed . . . the security department of the store" and obtained an escort to her vehicle twice, she did not report the parking garage incidents to Bloomingdale's until they already had "happened many times in the past." Alexander Dep. 69:7–20. These statements show that she did not view the incidents as severe enough to warrant reporting it immediately to the store or demanding a daily security escort. Also, while she reported to the police in November 2014 that Ms. Oda bullied her and broke her phone, she did not report the parking garage incidents to the police._ *See* Alexander Dep. 69:7–25. Therefore, on the evidence before me, none of these incidents, individually or together, were sufficiently severe or pervasive to establish a hostile workplace. *See Fox*, 247 F.3d at 178.

The issue that remains is whether the one incident that would not have occurred but for Ms. Alexander's race—Ms. Oda's utterance "stupid white bitch"—is, on its own, sufficiently extreme. "'[M]ere utterance of an . . . epithet which engenders offensive feelings in an employee' does not sufficiently affect the conditions of employment to implicate Title VII." *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 277 (4th Cir. 2015) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). Still, "an 'isolated incident[ ]' of harassment can 'amount to discriminatory

changes in the terms and conditions of employment,' if that incident is 'extremely serious.'" *Id.* (quoting *Faragher v. City of Boca Raton,* 524 U.S. 775, 788 (1998) (internal quotation marks omitted)). Notably, when as here, it is a co-worker who makes a race-based statement, the impact of the comment is considerably less than if a supervisor said it, because "a supervisor's power and authority invests his or her harassing conduct with a particular threatening character." *Id.* at 278 (quoting *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 763 (1998)).

In *Boyer-Liberto*, the Fourth Circuit held that "a single incident of extremely serious harassment, for example using a deeply offensive racial epithet, may create a hostile work place environment." *Walker v. Glaxosmithkline (GSK)*, No. RWT-15-2036, 2016 WL 4265341, at *4 (D. Md. Aug. 12, 2016) (citing *Boyer-Liberto*, 786 F.3d at 280); *see also Bacchus*, 2018 WL 3575055, at *8 (noting that "a single, isolated statement can establish a hostile work environment" if the statement was "extremely serious" and dismissing hostile workplace claim based on comment about employee's "language barrier," reasoning that it fell "far short of establishing a hostile work environment because that statement was not so extreme or humiliating as to interfere with Plaintiff's work" (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998))); *McLaurin v. Verizon Md., Inc.*, No. JKB-14-4053, 2015 WL 5081622, at *4 (D. Md. Aug. 26, 2015) ("Actionable hostility requires more than a mere utterance of an offensive epithet or simple teasing and offhand comments, though an isolated incident of harassment can be actionable if extremely serious." (citing *Boyer–Liberto*, 786 F.3d at 277)); *Howerton v. Bd. of Educ. of Prince George's Cty.*, No. TDC-14-0242, 2015 WL 4994536, at *15 (D. Md. Aug. 19, 2015) (differentiating comment that supervisor "only hired white people" from use of racial slur "porch monkey"). Here, a co-worker's isolated use of the insult "stupid white bitch" is more akin to the use of "black bastard" or a reference to a "language barrier" than to the utterance of an extremely

serious statement, such as a "deeply offensive racial epithet" like "porch monkey," and therefore it does not establish a hostile work environment on its own. *See Walker*, 2016 WL 4265341, at *4; *see also Boyer-Liberto*, 786 F.3d at 277–78, 280; *Bacchus*, 2018 WL 3575055, at *8; *McLaurin*, 2015 WL 5081622, at *4; *Howerton*, 2015 WL 4994536, at *15.

### 3. Imputable to the employer

Even if Ms. Alexander could establish race-based conduct that was sufficiently severe or pervasive, she also would have to demonstrate that the document was imputable to Bloomingdale's. *See Boyer–Liberto,* 786 F.3d at 277. "An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee." *Faragher v. City of Boca Raton,* 524 U.S. 775, 809 (1998). The only race-based conduct at issue is Ms. Oda's, and it is undisputed that Ms. Oda was not Ms. Alexander's supervisor.

When, as here, "the harassing employee is the victim's co-worker," rather than a supervisor, "the employer is liable only if it was negligent in controlling working conditions." *Vance v. Ball State University*, 570 U.S. 421, 424 (2013). Thus, the issue is whether the employer "knew or should have known about the harassment and failed to take effective action to stop it." *Ocheltree v. Scollon Prods., Inc.*, 335 F.3d 325, 333–34 (4th Cir. 2003) (noting that, in *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 759 (1998), the Supreme Court observed that "[n]egligence sets a minimum standard for employer liability under Title VII"); *see also Boyer-Liberto*, 786 F.3d 264, 278 (quoting *Vance* and *Ocheltree*).

It is undisputed that Bloomingdale's knew about Ms. Oda's alleged harassment of Ms. Alexander. *See, e.g.*, Ambach Dep. 15:15-16:15, 70:5–73:12, 77:4–78:1,79:4–83:11, 88:16–92:14, ECF No. 34-10; Cannaday Dep. 13:21–17:9, 68:13–69:14, ECF No. 34-5; Oda Dep. 62:12-

64:13, ECF No. 34-19. As for its action in response, on the record before me, with the exception of Alexander's conclusory remarks to the contrary, which shall be disregarded, *see supra* n.3, it is undisputed that Bloomingdale's investigated—by talking with those involved and any witnesses, as well as by reviewing any available video footage—but could not substantiate all but one of the complaints Ms. Alexander made against Ms. Oda. Ambach Dep. 15:15-16:15, 70:5–73:12, 77:4–78:1,79:4–83:11, 88:16–92:14; Cannaday Dep. 13:21–17:9, 68:13–69:14; Oda Dep. 62:12-64:13. And, as for the one complaint that was substantiated, Ms. Oda received a Formal Reminder based on her failure to treat Ms. Alexander with respect. Jt. Stip. Facts ¶ 30; Cannaday Dep. 70:18–71:1; Oda Dep. 21:21–23:20.[9]

Further, there is no evidence of race-based insults after the 2012 incident was investigated. Nor is there any evidence (or even allegations) that Ms. Oda harassed, intimidated, or threatened Ms. Alexander in the parking garage after Ms. Alexander reported "many" parking garage incidents to Bloomingdale's. *See* Alexander Dep. 69:7–25. Additionally, after Ms. Alexander reported the parking garage incidents to Bloomingdale's, she had a security escort to her vehicle on two occasions. On these facts, a reasonable jury could not conclude that Bloomingdale's "failed to take effective action to stop [the alleged race-based harassment]." *See Ocheltree*, 335 F.3d at 333–34; *see also E.E.O.C. v. Xerxes Corp.*, 639 F.3d 658, 674–75 (4th Cir. 2011) ("Title VII requires only that the employer take steps reasonably likely to stop the harassment" and does not "require[] an employer to dispense with fair procedures for those accused . . . . And a good faith investigation of the alleged harassment may satisfy the . . . standard, even if the investigation turns

_____

[9] Bloomingdale's also investigated numerous other incidents that Ms. Alexander reported regarding other Bloomingdale's employees, and as a result, it disciplined Genet Oda, Watani Hatcher, and Zahra Fardshisheh, who was Ms. Alexander's supervisor at the time; some of the discipline was formal. Cannaday Dep. 16:14–17:9, 58:2–9.

up no evidence of harassment. Such an employer may avoid liability even if a jury later concludes that in fact harassment occurred." (citations omitted)). Therefore, even if Ms. Oda's race-based actions were sufficiently severe or pervasive, Ms. Alexander has not shown that her actions could be imputed to Bloomingdale's. *See Vance*, 570 U.S. at 424; *Ocheltree*, 335 F.3d at 333–34. In sum, Ms. Alexander cannot prevail on her hostile work environment claim on the record before me, and Bloomingdale's is entitled to judgment as a matter of law. *See Boyer–Liberto*, 786 F.3d at 277.

<u>Retaliation Claim</u>

Claims of retaliation in violation of the Montgomery County Code are evaluation the same as retaliation claims brought pursuant to Title VII. *Tinoco v. Thesis Painting, Inc.*, No. GJH-16-752, 2017 WL 52554, at *5 (D. Md. Jan. 3, 2017) (quoting *Whittaker v. David's Beautiful People, Inc.*, No. DKC 14-2483, 2016 WL 429963, at *2 n.2 (D. Md. Feb. 4, 2016) (citing *Haas v. Lockheed Martin Corp.*, 396 Md. 469, 504 (2007))). When, as here, there is no direct evidence of retaliation, the *McDonnell Douglas* burden shifting framework applies. *See Foster v. Univ. of Maryland-E. Shore*, 787 F.3d 243, 250 (4th Cir. 2015). First, the employee "must . . . establish a prima facie case by showing: (i) 'that [she] engaged in protected activity,' (ii) 'that [her employer] took adverse action against [her],' and (iii) 'that a causal relationship existed between the protected activity and the adverse employment activity.'" *Id.* (quoting *Price v. Thompson*, 380 F.3d 209, 212 (4th Cir. 2004), *abrogated on other grounds as stated in Foster*, 787 F.3d at 249). If the employee establishes a prima facie case, "[t]he burden then shifts to the [employer] to show that its purportedly retaliatory action was in fact the result of a legitimate non-retaliatory reason." *Id.* (citing *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 285 (4th Cir. 2004)). Finally, "[i]f the employer makes this showing, the burden shifts back to the plaintiff to rebut the

employer's evidence by demonstrating that the employer's purported nonretaliatory reasons 'were not its true reasons, but were a pretext for discrimination.'" *Id.* (quoting *Hill*, 354 F.3d at 285 (quoting *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 143 (2000))). This framework allows a plaintiff

> to prove causation even without direct evidence of retaliatory animus: If a plaintiff can show that she was fired under suspicious circumstances and that her employer lied about its reasons for firing her, the factfinder may infer that the employer's undisclosed retaliatory animus was the actual cause of her termination. *Reeves,* 530 U.S. at 148, 120 S.Ct. 2097 ("[A] plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated.").

*Id.*

The standard for demonstrating causation as part of a prima facie case of retaliation and the standard for establishing pretext "are not identical." *Id.* at 252. While an employee trying to prove pretext must show that "the real reason for [her] termination was her employer's retaliation," or, stated differently, that she "would not have been terminated but for her employer's retaliatory animus," *id.*, "the burden for establishing causation at the prima facie stage is 'less onerous,'" *id.* at 251 (quoting *Williams v. Cerberonics, Inc.,* 871 F.2d 452, 457 (4th Cir. 1989)).

### 1. *Prima Facie Case*

It is undisputed that Ms. Alexander engaged in protected activity by filing an EEOC charge on April 26, 2016, and Bloomingdale's took an adverse employment action when it terminated Ms. Alexander's employment approximately two months later, on June 29, 2016. Jt. Stip. Facts ¶¶ 48, 53; Def.'s Mem. 26; Pl.'s Opp'n 21–22. Ms. Alexander does not address any other protected activity or adverse employment action as the basis for this claim. *See* Pl.'s Opp'n 21–22. Thus, the only issue at the first step in the *McDonnell Douglas* framework is whether a causal link existed between the two events. *See* Def.'s Mem. 27; Pl.'s Opp'n 22.

As noted, it "is not an onerous burden" to prove causality for purposes of establishing a prima facie case. *Strothers v. City of Laurel, Maryland*, 895 F.3d 317, 335–36 (4th Cir. 2018) (citing *Foster*, 787 F.3d at 251; *Burgess v. Bowen*, 466 F. App'x 272, 282 (4th Cir. 2012) ("[V]ery little evidence of a causal connection is required to establish a prima facie case of retaliation." (citation omitted))). "An employee may establish *prima facie* causation simply by showing that (1) the employer either understood or should have understood the employee to be engaged in protected activity and (2) the employer took adverse action against the employee soon after becoming aware of such activity." *Id.* (citing *Carter v. Ball*, 33 F.3d 450, 460 (4th Cir. 1994); *Williams v. Cerberonics, Inc.*, 871 F.2d 452, 457 (4th Cir. 1989); *Burgess*, 466 F. App'x at 282).

Here, it is undisputed that Bloomingdale's was aware of Ms. Alexander's EEOC charge by approximately April 28, 2016 and terminated her employment on June 29, 2016, approximately two months later. Jt. Stip. Facts ¶¶ 49, 53. This Court and the Fourth Circuit have held that approximately two months may be sufficient temporal proximity to establish a causal relationship. *See Muldrow v. Blank*, No. PWG-13-1200, 2014 WL 938475, at *12 (D. Md. Mar. 10, 2014) (plaintiff stated a claim for retaliation where approximately two months lapsed between protected activity and adverse employment action); *Carter v. Ball*, 33 F.3d 450, 460 (4th Cir. 1994) (plaintiff established prima facie case where approximately four months passed between protected activity and adverse employment action). But, the Fourth Circuit also has observed that "[i]n order for a temporal relationship to support to a reasonable inference of retaliatory causation, the temporal relationship must be "very close." *Smith v. Renal Treatment Centers-Mid-Atl., Inc.*, No. RDB-16-3656, 2018 WL 950018, at *10 (D. Md. Feb. 20, 2018) (quoting *Pascual v. Lowe's Home Ctrs.*, 193 Fed. App'x 229, 233 (4th Cir. 2006)), *aff'd sub nom. Smith v. Renal Treatment Centers - Mid-Atl., Inc.*, 736 F. App'x 68 (4th Cir. 2018). And, on that basis, this Court more recently has held

that "a one-month timeframe alone does not support an inference of causation, . . . when [the employee] exhibited unprofessional behavior [on] two separate occasions *after* [her] November 1 complaint and in direct violation of [her employer's] prior warnings." *Id.*

Thus, while approximately two months certainly is "sufficiently long so as to weaken significantly the inference of causation between the two events," depending on the facts of the case, the inference still may be sufficient for an employee to establish a prima facie case of retaliation. *See King v. Rumsfeld*, 328 F.3d 145, 151 n.5 (4th Cir. 2003) ("King's firing came two months and two weeks following Carlson's receipt of notice that King had filed an EEO complaint . . . . [I]n the context of this particular employment situation, this length of time does not undercut the inference of causation enough to render King's prima facie claim unsuccessful."); *see also Winston v. Maryland*, No. PWG-17-2477, 2018 WL 5786130, at *10 (D. Md. Nov. 5, 2018) ("[C]ausation may be present when more than one or two months have passed, but only where there are additional facts to establish the causal connection, beyond the timeline of events." (citing *Lettieri v. Equant, Inc.*, 478 F.3d 640, 650 (4th Cir. 2007)). For example, "evidence of recurring retaliatory animus during the intervening period can be sufficient to satisfy the element of causation." *Lettieri*, 478 F.3d at 650.

Bloomingdale's contends that, even if the EEOC charge and the termination of Ms. Alexander's employment were close enough in time, "when the adverse employment action is part of progressive discipline that began before the protected activity, there is no inference of a causal connection regardless of temporal proximity." Def.'s Mem. 27 (citing *Francis v. Booz, Allen & Hamilton, Inc.*, 452 F.3d 299, 309 (4th Cir. 2006); *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001); *James v. Verizon*, 792 F. Supp. 2d 861, 867-68 (D. Md. 2011), *aff'd*, 458 Fed. Appx. 262 (4th Cir. 2011)). Plaintiff attempts to distinguish *Francis* and *James*, asserting

that the *Francis* Court applied a different standard because it was analyzing a claim under the Uniformed Services Employment and Reemployment Rights Act of 1994 ("USERRA"), 38 U.S.C. §§ 4301–4333, and *James* involved a fact pattern in which the plaintiff was on a performance improvement plan and the termination of her employment "coincided with the end of the plaintiff's PIP period." Pl.'s Opp'n 24. She notes that in *James*, "the Court held that it was 'predictable and legitimate that Plaintiff's supervisors would take a fresh look at Plaintiff's performance [at the end of the PIP period]," whereas in this case, even though her Decision Making Leave Form "stated that there was to be a follow-up meeting to discuss Plaintiff's progress[,] [t]his meeting never took place." *Id.* (emendation in Pl.'s Opp'n; citations to record omitted).

In *Francis*, the plaintiff had been working for her employer since 1996, while also serving as a petty officer in the United States Naval Reserve. 452 F.3d at 301. On March 16, 2003, she deployed on active duty; she returned to work on August 11, 2003. *Id.* After she returned, Francis repeatedly "left work early without authorization," and she missed a conference call. *Id.* at 302. In the employer's view, she violated its "employee conduct policy" through her "behavioral and attendance issues." *Id.* On August 29, 2003, Francis informed her employer "that she believed that her USERRA rights were being violated." *Id.* at 301. Two and a half months later, on November 14, 2003, the employer issued Francis a Notice of Probation, "warn[ing] [her] that 'failure to immediately address these issues would result in termination of . . . employment.'" *Id.* It then provided her "a plan for improvement," again warning her that her employment would be terminated if she did not show "immediate, substantial, and sustained progress." *Id.* Within two weeks of "receiving the Notice of Probation, Francis again left the office without authorization in order to attend to a customer at an off-site location." *Id.* Then, on December 15, 2003, one month after issuing the Notice of Probation, the employer terminated Francis's employment. *Id.*

When Francis filed suit, claiming that "her exercise of USERRA rights was a motivating factor in the decision to terminate her," she "relie[d] exclusively on the 'temporal proximity' between her August 28 complaint and November Notice of Probation to prove [her claim]."[10]  *Id.* at 309.  The Fourth Circuit concluded that, "[w]hile temporal proximity between a complaint and an adverse employment action can, in some cases, be used to survive summary judgment, it [did] not suffice [for Francis]." *Id.*  The court reasoned that "[t]he actions that led to Francis' probation and termination began *before* her protected activity, belying the conclusion that a reasonable factfinder might find that [the employer's] activity was motivated by Francis' USERRA complaints." *Id.*  The Fourth Circuit observed that the Second Circuit has held that, "[w]here timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise," *id.* (quoting *Slattery v. Swiss Reinsurance Am. Corp.,* 248 F.3d 87, 95 (2d Cir. 2001)), and the First Circuit has noted that "conduct that occurs both before and after the event leading to the alleged retaliation cannot form the basis of a Title IX retaliation claim," *id.* (citing *Frazier v. Fairhaven Sch. Comm.,* 276 F.3d 52, 67 (1st Cir. 2002)).

In *James*, the employer placed Diann James on a performance improvement plan ("PIP") on July 11, 2006; "[t]he PIP identified four alleged deficiencies in Plaintiff's performance in 2006[,] . . . provided 60 days for Plaintiff to improve in those areas," and informed her that "she could be terminated if she had not made progress after the 60 days."  792 F. Supp. 2d at 865.

---

[10] To prove a retaliation claim under USERRA, a plaintiff must show that "her exercise of her USERRA rights was 'a motivating factor in [the employer's] action, unless [the employer] can prove that the action would have been taken in the absence of' [the employee's] USERRA complaints." *Francis v. Booz, Allen & Hamilton, Inc.*, 452 F.3d 299, 309 (4th Cir. 2006).  Thus, the initial burden is the same as under the *McDonnell Douglas* framework in a Title VII case.  *See Foster*, 787 F.3d at 251.

Approximately sixty days later, James engaged in a protected activity by announcing on September 11, 2006 that she would be on leave under the Family and Medical Leave Act, 29 U.S.C. §§ 2601–54 ("FMLA"). *James*, 792 F. Supp. 2d at 865. The employer terminated her employment on September 22, 2006, and she filed suit. *Id.* at 865–66.

With regard to James's claim that she was "terminated because of her serious health condition," in violation of the FMLA, this Court observed that "[a]lthough there was a close temporal proximity between the time when Plaintiff announced that she would be on [FMLA] leave (September 11), and the date she was informed of her termination (September 22), mid-September is also when Plaintiff's PIP period came to an end." *Id.* at 867–68. Under those circumstances, the Court found that "[i]t was therefore completely predictable and legitimate that Plaintiff's supervisors would take a fresh look at Plaintiff's performance around that time in order to determine whether Plaintiff had satisfactorily completed her PIP objectives." *Id.* at 868. It concluded that, despite the temporal proximity, no inference of improper motive arose because "the temporal proximity between Plaintiff's leave status and her termination [wa]s fully accounted for by non-invidious motivations and circumstances" and there was no other evidence of retaliatory animus. *Id.*

*Myles-Anderson v. Emmes Corp.*, No. GJH-15-2461, 2017 WL 881812 (D. Md. Mar. 3, 2017), is on point. There, the employee "relie[d] exclusively on the 'temporal proximity' between her [protected activity] on September 18, 2013, and her termination on November 7, 2013, and provide[d] no other details suggesting a causal connection between her complaint and her termination." *Id.* at *4. The difference in Ms. Alexander's case is that *more* time elapsed between the protected activity and the employee's termination, slightly more than two months as opposed to less than two months. In *Myles-Anderson*, as here, "the actions that led to Plaintiff's termination

began *before* her [protected activity]." *Id.* Myles-Anderson "received no fewer than two emails bringing her unsatisfactory performance to her attention [with the first sent more than four months before her termination], as well as two formal written warnings of possible termination, well before [she made an internal complaint]." *Id.* This Court concluded that the plaintiff "failed to establish a causal connection between her protected activity and her termination because she ha[d] not 'adduce[d] any admissible evidence to suggest a connection between [her] complaints about alleged workplace discrimination and [her] eventual termination.'" *Myles-Anderson*, 2017 WL 881812, at *4 (quoting *Roberts*, 2015 WL 3932398, at *11, in which the court granted summary judgment in favor of the employer on a retaliation claim where the termination of employment "was the result of [the employee's] lengthy and well-documented performance deficiencies").

Here, as in *Francis* and *Myles-Anderson*, the employer warned Ms. Alexander repeatedly that her performance was unsatisfactory before she engaged in the protected activity that she claims led to the termination of her employment. She received Formal Reminders on May 22, 2014, November 6, 2014, and June 25, 2015; she received Decision Making Leave on February 11, 2015; she received an addendum to the February Decision Making Leave Form on December 9, 2015; and she received Decision Making Leave again on April 14, 2016. She did not file her EEOC charge until April 26, 2016, after she had received these six disciplinary forms over the course of approximately two years. The forms put her on notice that she had repeatedly been disrespectful to her co-workers and supervisors and repeatedly worked without prior approval when she was not scheduled to work, in violation of store policy, and they cautioned that her employment could be terminated if her performance did not improve. *See, e.g.*, May 22, 2014 Formal Reminder 1 (lack of respect and unapproved overtime); Nov. 6, 2014 Formal Reminder 1 (lack of respect); Feb. 11, 2015 Decision Making Leave Form 1 (lack of respect and unapproved overtime); Addendum,

Ambach Decl. Ex. B, ECF No. 34-13, at 4 (lack of respect); April 14, 2016 Decision Making Leave Form 1, 3 (lack of respect and unapproved overtime). According to company policy, Bloomingdale's could terminate her employment after the April 14, 2016 Decision Making Leave without further communications with or warnings to Alexander. *See* Associate Handbook, Agnew Decl. Ex. A, ECF No. 34-6, at 23.

Ms. Alexander argues that, notwithstanding this history, "[t]he inference of a causal connection is strengthened by the fact that Plaintiff presented a complaint, on December 28, 2015, to [Bloomingdale's management and human resources], stating that she was being subjected to an 'unsafe and hostile work environment' and was being 'harassed,'" and another complaint on March 13, 2014 [in which] she stated that Watani Hatcher's behavior toward her was 'highly demeaning and degrading to [her].'" Pl.'s Opp'n 25 (quoting Dec. 28, 2015 Compl. to Def., ECF No. 34-30; Mar. 13, 2014 Compl. to Def., ECF No. 34-36). Yet, the first action Bloomingdale's took after the March 13, 2014 Complaint was the May 22, 2014 Formal Reminder, more than two months later, and the first action it took after the December 28, 2015 Complaint was the June 25, 2015 Formal Reminder, half a year later. The temporal proximity between these complaints and Bloomingdale's allegedly retaliatory responses is even more attenuated than the proximity between her EEOC Charge and the termination of her employment. Therefore, this timing does not bolster her argument that her EEOC Charge and the termination of her employment were causally connected.

Ms. Alexander relies on the absence of "a follow-up meeting to discuss Plaintiff's progress" following the April 14, 2016 Decision Making Leave as evidence of retaliatory animus between her April 26, 2016 protected activity and her June 29, 2016 termination. *See* Pl.'s Opp'n 24; *see id.* at 22–66. She does not explain how the failure to hold a follow-up meeting shows

retaliatory animus, however, especially in light of the evidence that Ms. Alexander's supervisors and the human resources manager already had addressed Ms. Alexander's performance issues repeatedly and she often was unwilling to listen or discuss the issues. Moreover, as noted, Bloomingdale's did not need to communicate further with Ms. Alexander after giving her Decision Making Leave, before terminating her employment. *See* Associate Handbook, ECF No. 34-6, at 23.

Further, the other events during that intervening period do not support an inference of retaliation. Defense counsel asked Ms. Alexander in her deposition whether she had worked overtime without approval five times in early June 2016—on June 3, 8, 9, 10 and 11, 2016. Alexander Dep. 180:24–181:1, 187:9–190:16, 193:8–194:8, 195:10–196:1. Although she testified that she did not recall the specific dates, Ms. Alexander did not deny having worked overtime repeatedly during that time period. *Id.* Notably, these dates were after Ms. Alexander filed her EEOC charge, and after she received the Formal Reminders and Decision Making Leave. In her view, working overtime "was common practice" and necessary to meet "actual demands from customers," but she was singled out and disciplined for it. *Id.* at 188:11–16, 189:2–4, 190:4–16; *see also id.* at 196:7–20, 202:2–15. According to Alexander, the limitations on overtime hours "didn't apply to [her] because customers were coming and they were flowing to [her], . . . and [she] had millions of sales to prove that." She also stated that she did not seek her supervisor's permission "because she was abusive and she interfered with [her] professional way of conduct," *id.* at 200:18–201:9, and that she stayed late "because [she] had legitimate reasons to take care of [her] clients," *id.* at 201:10–21. Alexander Dep. 193:8–194:8, 195:10–196:1.

What this evidence shows is that, although Ms. Alexander's date of termination did not coincide with the end of a performance improvement plan, as in *James*, it nonetheless occurred

less than three weeks after Ms. Alexander engaged in the same conduct that led, in part, to the April 14, 2016 Decision Making Leave: She worked overtime without approval on June 3, 8, 9, 10, and 11, and her employment was terminated on June 29, 2016. And, Bloomingdale's policy allowed for employment to be terminated under such circumstances without further notice. Thus, it was "completely predictable and legitimate that Plaintiff's supervisor's would take a fresh look at Plaintiff's performance around that time" and terminate her employment, and the minimal temporal proximity present in this case was, as with the temporal proximity in *James*, "fully accounted for by non-invidious motivations and circumstances." *See James*, 792 F. Supp. 2d at 867–68.

Certainly, Ms. Alexander provided conclusory testimony that, when her supervisor reported her overtime hours on June 3, 2016 and acted aggressively toward her on June 3, 2016, that conduct was retaliatory. Alexander Dep. 190:12–16, 191:23–193:7. But, that report was only one of many, and her negative interaction with her supervisor also, unfortunately, was one of many. Further, Alexander testified that she "never had any problem to obtain overtime before the incident with Genet Oda of 2012," Alexander Dep. 80:4–5, which shows that her "problem[s] . . obtain[ing] overtime" began closer to her 2012 incident with Ms. Oda than to her April 2016 EEOC charge.

Taking the facts in the light most favorable to Ms. Alexander as the non-moving party, *see Ricci v. DeStefano,* 557 U.S. 557, 585–86 (2009), three reasonable factual findings can be made. First, Ms. Alexander's employment was terminated after she had a series of conflicts with her co-workers and supervisors, due at least in part to her failure to treat them with respect. Second, her employment was terminated after she received six formal warnings regarding her lack of respect and her repeated failures to follow Bloomingdale's policies, including its policy that overtime had

to be approved. Third, her employment was terminated after she continued to be disrespectful of her co-workers and supervisors and to work overtime without prior approval, despite the formal warnings.

But, on the record before me, a reasonable factfinder could not conclude that Alexander's termination was causally connected to her April 2016 EEOC charge. *See Lettieri*, 478 F.3d at 650; *Francis*, 452 F.3d at 309; *Smith*, 2018 WL 950018, at *10; *Myles-Anderson*, 2017 WL 881812, at *4. Given the documented history of Ms. Alexander's performance issues and the numerous warnings she received before engaging in protected activity, Ms. Alexander cannot establish a causal link by temporal proximity alone. *See Lettieri*, 478 F.3d at 650; *Francis*, 452 F.3d at 309; *Smith*, 2018 WL 950018, at *10; *Winston*, 2018 WL 5786130, at *10. And, Ms. Alexander has failed to point to any other evidence that would demonstrate "a connection between [her April 2016 EEOC] complaint[] about alleged workplace discrimination and [her] eventual termination." *See Myles-Anderson*, 2017 WL 881812, at *4; *Roberts*, 2015 WL 3932398, at *11. Therefore, she has failed to establish a prima facie case. *See Foster v. Univ. of Maryland-E. Shore*, 787 F.3d 243, 250 (4th Cir. 2015).

## 2. *Legitimate, non-retaliatory reason*

Significantly, even if a causal connection existed and the burden shifted to Bloomingdale's "to show that its purportedly retaliatory action was in fact the result of a legitimate non-retaliatory reason," *Foster v. Univ. of Maryland-E. Shore*, 787 F.3d 243, 250 (4th Cir. 2015), the same evidence that Bloomingdale's warned Ms. Alexander repeatedly that her performance was dissatisfactory also establishes the employer's "legitimate, non-retaliatory reason for her termination, namely, her well-documented performance issues." *See Myles-Anderson*, 2017 WL 881812, at *4.

*3. Pretext*

The burden shifts to Ms. Alexander to show pretext by demonstrating that the employer's purported nonretaliatory reasons "were not its true reasons" and that Bloomingdale's would not have terminated her employment but for the protected activity in which she engaged. *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 143 (2000); *Foster*, 787 F.3d at 250, 252. She could prevail by "show[ing] that she was fired under suspicious circumstances and that her employer lied about its reasons for firing her," or by offering "'sufficient evidence to find that the employer's asserted justification is false.'" *Foster*, 787 F.3d at 250 (quoting *Reeves,* 530 U.S. at 148). Yet, she has not done so.

In Plaintiffs' view, the reason that Bloomingdale's provided in its Memorandum for terminating her employment—that she "was 'mistreating her co-workers, working off the clock, working off schedule without partnering with a manager, and providing poor customer service'"— was untrue because Bloomingdale's "did not provide her with any reason for her termination" at the time her employment ended. Pl.'s Opp'n 27 (quoting Def.'s Mem. 30). Not so. Bloomingdale's informed Ms. Alexander in the April 14, 2016 Decision Making Leave Form that it had "had numerous conversations related to [her] level of respect towards [her] co-workers" and had "spoken to [her] about respectful treatment of [her] supervisor, and of other selling partners both in [her] department, and in other departments in [the] store." April 14, 2016 Decision Making Leave Form 1, 3. Additionally, the Decision Making Leave Form described incidents on December 23, 2014 and February 5, 2015, in January 2016, and on February 1, 2016 and March 21, 2016 in which she had been disrespectful to co-workers and a senior manager and had worked, without permission, during her time off. *Id.* at 3. Also, Bloomingdale's informed her through the Associate Handbook that her employment could be terminated following Decision Making Leave

without further notice. *See* Associate Handbook, ECF No. 34-6, at 23. The fact that Bloomingdale's did not restate these bases at the time that it terminated her employment is not evidence that its justification is false.

Ms. Alexander also argues that "the circumstances surrounding Plaintiff's termination are highly suspect," based on the temporal proximity of her protected activity and the termination of her employment. *See* Pl.'s Opp'n 27. But, for the same reasons that she failed to establish a causal connection for purposes of her prima facie case, where the burden is "less onerous," she also cannot rely on timing to prove pretext. *See Foster v. Univ. of Maryland-E. Shore*, 787 F.3d 243, 251 (4th Cir. 2015).

Finally, according to Ms. Alexander, the time she worked "off the clock or off schedule" cannot be the real reason for her termination. Pl.'s Opp'n 29. As she sees it,

> Defendant's argument is essentially that Plaintiff was such a hard worker and so dedicated an employee that she was willing to go above and beyond by working for Defendant even when Defendant was not compensating her. However, there is evidence in the record that Defendant's employees are commonly expected to work beyond their scheduled hours and that Defendant typically turns a blind eye to such practices. In fact, such behavior demonstrates the Plaintiff had a deep commitment to her clients. It was her drive and dedication that enabled her to become such a successful salesperson.

Pl.'s Opp'n 29 (citing Alexander Aff. ¶¶ 38–39, ECF No. 34-22). Insofar as Ms. Alexander argues that overtime and off-the-clock work was "commonly expected" and allowed for other employees, though not for her, she fails to identify any non-conclusory evidence in support of her assertion, as previously discussed. Moreover, Bloomingdale's requirement that employees obtain supervisor approval is a legitimate requirement—and one stated in the Associate Handbook, as well as repeatedly in the disciplinary forms that Ms. Alexander received—given the expense of overtime compensation for employers. *See, e.g.*, 29 U.S.C. § 207(a)(1) (requiring compensation "for a workweek longer than forty hours . . . at a rate not less than one and one-half times the regular rate

at which he is employed"); Associate Handbook, ECF No. 34-6, at 19 ("Before working any overtime, you must have your supervisor's approval. Record on the time-keeping system the exact, actual numbers of overtime hours you worked. You may never work without being clocked in and you may not take work home under any circumstances."). Therefore, Bloomingdale's is entitled to judgment as a matter of law on Plaintiff's retaliation claims as well. *See Foster*, 787 F.3d at 250.

## Conclusion

In sum, the Motion for Summary Judgment that Bloomingdale's filed, ECF No. 30, IS GRANTED. A separate order will issue.

                                          _____/S/_____
                                          Paul W. Grimm
                                          United States District Judge

lyb